## Samples v. Commonwealth

*C. Richard Morton,* for appellant.
*John B. Rengier,* of *Rengier, Musser & Stengel,* for appellee.
*Louis A. Naugle,* for Department of Environmental Resources.

PAUL E. WATERS, *Chairman,* January 22, 1976 — This matter comes before the board as an appeal from the issuance by the Department of Environmental Resources (hereinafter "DER") of a permit under the Water Obstructions Act of June

25, 1913, P.L. 555, as amended, 32 P.S. §681, et seq., to the County of Lancaster, for the construction of a culvert to replace a bridge crossing the Coon Creek. Appellant, Warren K. Samples, is a resident of Lancaster County with property abutting the creek and, based on his experience of previous flooding in the area and his experts, he believes the culvert, which will be substantially smaller than the presently unusable old bridge, will cause damage to his property and, perhaps, endanger life.

## FINDINGS OF FACT

1. Appellant, Warren K. Samples, owns land on all four sides of the proposed culvert, and resides within a few hundred feet of the water.

2. By application dated May 20, 1975, the County of Lancaster applied to DER's Division of Dams and Encroachments for a permit to erect a plate-arch culvert having a span of 23 feet, 0 inches with a rise of 6 feet, 11 inches at Station 3+82 on T-301 in Little Britain Township, on Coon Creek.

3. T-301 is a lightly traveled township road and the land surrounding the proposed culvert site is rural in character as the land adjacent to Coon Creek and extending for some distance on both sides is either lawn or pasture/woodland.

4. There is now a bridge across Coon Creek at Kinseyville owned by the County of Lancaster which carries Little Britain Township Road no. 301 over Coon Creek.

5. This bridge is approximately 1,000 feet upstream along the thread of Coon Creek from the confluence of Coon Creek with its parent stream, Octoraro Creek, and is within a special flood hazard area on plate no. H08 of FIA (HUD) Flood Hazard

Boundary Maps of Little Britain Township, Lancaster County, Pa.

6. Sections 105.91 and 105.104(d) of the department's regulations, 25 Pa. Code, list the information required to be submitted to DER by an applicant seeking a permit for construction of a culvert.

7. Independent calculations were made by DER which showed the proposed culvert would pass a 25-year flood, with a safety factor, according to the Penn State University III (PSU III) method.

8. Section 105.101(b) authorizes the approval of a culvert with a waterway opening smaller than required by curve "B" sometimes referred to as the 100-year flood, in regions where no "drainage" will result.

9. DER interprets subsection 105.101(b) as reading "damage" rather than "drainage," on the basis that it is an obvious error.

10. The existing bridge has a clear span of 62 feet between abutments, a waterway opening of 657.7 square feet, does not restrict the flow of Coon Creek at any stage, and allows Coon Creek to flow through appellant's land in its natural mode, course and volume at any stage.

11. The existing bridge does not create any potential of danger from flooding either to life or property, does not change the natural course of Coon Creek, and does not create the potential to change or divert the natural course of Coon Creek.

12. The County of Lancaster proposes to tear down the existing bridge and replace it with a plate-arch culvert on the same site. The proposed culvert has a waterway opening of 165.6 square feet, a waterway opening only one fourth as large as the waterway opening of the existing bridge.

13. On March 5, 1975, the County of Lancaster submitted data to DER which purported to prove that the peak flood times of Coon and Octoraro Creeks occur 21 hours apart and asserted that this proved there was no necessity to submit the complete hydrologic and hydraulic reports including backwater computations, which DER had requested, through Mr. Butler.

14. On April 2, 1975, 28 days after the County of Lancaster submitted the data of March 5, 1975, Mr. Butler again informed the county that it should submit the complete hydrologic and hydraulic reports with detailed analysis of the interaction between Coon Creek and Octoraro Creek he had previously requested.

15. The complete hydrologic and hydraulic reports with backwater computations requested by Mr. Butler were never submitted to DER by the County of Lancaster because the County of Lancaster felt it should not have to spend the money to make the reports.

16. On May 7, 1975, the County of Lancaster submitted to DER its application for a permit to build the proposed culvert with a letter from its solicitor repeating its reliance upon the data submitted on March 5, 1975, and refusing to design the proposed culvert to pass a 100-year flood.

17. The waterway opening of the culvert the County of Lancaster proposes to build to replace the existing bridge was not designed using Curve "B" but instead was designed using the Pennsylvania State University III method from a PennDOT manual to pass a flow of 1,150 cubic feet per second—a 25-year flood.

18. The Regulations of DER which control the size of waterway openings of bridges and culverts

as published in 25 Pa. Code §105.104 generally require the use of curve "B" which would require that the proposed culvert have a waterway opening at least large enough to pass a flow of 2,079 cubic feet per second. Curve "B" is the Pennsylvania equivalent of the 100-year flood.

19. DER did not require the County of Lancaster to use curve "B" in designing the culvert it proposes to build to replace the existing bridge in the belief that its regulation, as published in 25 Pa. Code §105.101(b), excused the use of curve "B" in this case and allowed DER to consider other factors in passing upon the county's application, those factors being the type of structure, the type of road and the degree of risk.

20. The size of the waterway opening that should be used if the County of Lancaster does replace the existing bridge with another bridge or a culvert cannot be determined accurately unless backwater computations are made.

21. The data submitted to DER by the County of Lancaster in support of its application for a permit to build the proposed culvert assumed that the proposed culvert would be governed by inlet control.

22. Physical conditions at the site are such that the culvert the County of Lancaster proposes to build to replace the existing bridge may be governed by outlet control not inlet control, requiring a much larger waterway opening than that proposed by the County of Lancaster.

23. The waterway opening of the culvert the County of Lancaster proposes to build to replace the existing bridge may not be wide enough to allow large logs and entire trees to be carried through it and may clog during floods.

## DISCUSSION

The County of Lancaster applied for and received a permit from DER to construct a culvert to take the place of an old bridge over Coon Creek which is no longer usable.

The Commonwealth regulates the right of the county to build bridges and water obstructions under the Act of June 25, 1913, P. L. 555, sec. 1-10, as amended, 32 P.S. §§681-691. The administration of this act is within the jurisdiction of DER. The act provides:

". . . it shall be unlawful for any person . . . to construct any dam or other water obstruction; . . . or in any manner to change or diminish the course, current, or cross section of any stream . . . without the consent or permit [of DER]." 32 P.S. §682.

Pursuant to this statute, DER promulgated certain regulations concerning water obstructions. 25 Pa. Code §105.101(b) provides:

"In regions where no drainage[1] will result from too small an opening, it may not be advisable to provide for large floods which may occur only occasionally, and an opening large enough to pass the frequent flood[2] is all that is necessary."

The leading case on this area of law, Commonwealth Water and Power Resources Board v. Green Spring Co., 394 Pa. 1, 145 A.2d 178 (1958), states that the act is intended to prevent water obstructions which present a potentiality of danger to life or

---

1. Although the regulation used the word *drainage,* this is an obvious typographical error and all parties agree that it was intended to say *damage* or *danger* but not *drainage.*

2. The regulations establish a requirement to provide for the 25-year flood, which DER has reasonably construed to be the frequent flood.

property. In issuing permits under this act, the above limitations must be followed by DER. Let us apply these guidelines to the facts.

The permitted culvert will take the place of a bridge which is more than three times larger for the purpose of water passage.

Appellant has argued that the culvert must be designed for the 100-year flood, and bases this on Federal statutes,[3] and proposed State legislation.[4] This argument carries its own refutation. There would be no need for the new State legislation requiring 100-year flood figures be used for all water obstructions, if the law already requires it in all cases. We believe the regulations as construed by DER to require construction based on the 25-year flood in the circumstances of this case, to be proper. Certainly, there are locations where 100-year flood figures would be required, but this small stream in a rural area which is lightly traveled has no such mandate.

Much expert testimony was presented on the very technical question of whether the culvert will have inlet or outlet control. After all is said and done and the conflicting testimony of all experts on both sides is analyzed, the only thing that is clear is that the answer is not clear. It is not a question of who told the truth, but whether, without further study, either party can be sure of the validity of his opinion, no matter how strongly held. Another matter which probably deserved more attention than it received is the question of the likelihood and effect of

_____

3. Appellant argues that county and township laws as well as Federal law specifically require the 100-year flood figures to be used. We believe such legal violations, if they exist, must be pursued at the proper judicial level.

4. Senate Bill 1.

clogging[5] of the proposed culvert which is only one fourth the size of the present bridge opening.

The real problem that we have, in light of what has already been said, is the fact that DER itself recognized that the permit application contained insufficient data to reach a conclusion with regard to damage or danger which could be expected from the proposed new construction by the county. On April 2, 1975, DER through Mr. Butler, Chief of the Division of Dams and Encroachments, wrote to the county and said:

". . . We will require a resubmittal of the permit application since the original permit has now expired. This application must be accompanied by the following:

"1. Complete hydrologic and hydraulic report with detailed analysis of the interaction between Coon Creek and Octoraro Creek.

"2. Complete plans sufficient to properly appraise the application. These plans should include profile of the stream for 500 ft. on each side with cross sections sufficient in number and location to permit a rigorous hydraulic analysis and a plan showing the stream, the road, all neighboring structures, and the key elevations of all roads and structures. The plans previously submitted did not include the above mentioned information . . ."[6]

---

5. There is a large tract of woodland upstream from the bridge and debris and large trees are to be expected during storms to wash toward the culvert.

6. The Water Obstruction Act specifically requires:

"Each application for the consent or permit required by the second section of this act shall be accompanied by complete maps, plans, profiles, and specifications of such water obstruction, or of the said changes or additions proposed to be made, and such other data and information as the commission may require." 32 P.S. §683.

Finally, we cannot help but note that DER concedes that appellant is right when he alleges that there will be some damage caused to his property if the permit is allowed to be carried out. DER, however, is satisfied because it will be "repairable damage."[7] It is interesting to note that there was no discussion of who would make these repairs which cause DER no concern. Certainly, a citizen has some flood risk which cannot be foreclosed when he elects to live beside a body of water such as here. A prospective builder, or permittee, was never intended to be an insurer. We do believe, however, when that risk is changed through no fault of his own, a property owner is entitled to know with the best degree of accuracy reasonably possible what that *increased* risk to life and property will be. This has not been done. DER apparently decided that additional information on the backwater effect of the culvert was not needed after the county balked at providing it because of the added expense. This culvert will presumably be in use long after the individuals involved in this case are gone, and, it is with this long-range future in mind, that we believe the additional precaution is now justified. We believe it reasonable to assume that the future will bring more, rather than less, traffic to this sparsely populated area.

Inasmuch as there are reasonable grounds for DER to have required the submission of complete hydrologic and hydraulic reports in order to ascertain the nature and the extent of the risk of additional flood damage, we hereby set aside the permit and remand the matter to DER with instructions

---

7. Erosion, portions of the land sometimes unusable for certain purposes, road temporarily flooded out and closed even to emergency vehicles such as fire trucks or ambulances.

not to issue same until the county submits the necessary reports[8]—and DER can make an intelligent and fully-informed decision as to whether the permit should issue.

The permittee, Lancaster County, assumed that there would be no backwater effect from the Octoraro Creek which would require any adjustment in the culvert opening. Apparently, after some misgivings, DER joined this assumption. The record before us raises enough doubt as to the accuracy of this assumption that we believe a detailed analysis of the hydrologic variables as originally suggested by DER is necessary in order to finally resolve the question. If it turns out that the assumption was correct, we are satisfied that DER properly used the 25-year flood as an indicator of culvert size. If, on the other hand the assumption was not accurate, we would expect DER to require the necessary adjustments in the size of the culvert before lifting the permit suspension.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter of this appeal.

2. The regulations of the department, §105.-101(b), promulgated pursuant to the Water Obstruction Act provide that 25-year flood figures may properly be used in determining the size of a culvert opening where the damage from floods of greater frequency will be de minimis.

3. Where a permit is sought for construction of a culvert on a creek under the Water Obstruction Act of June 25, 1913, P.L. 555, as amended, 32 P.S.

---

8. Copies of the calculations shall also be made available to appellant.

§681, et seq., and the application therefor does not clearly show that there will be no backwater effect from another body of water which is within 1,000 feet thereof, DER must require a detailed analysis of the backwater effect on the proposed culvert.

## ORDER

And now, January 22, 1976, permit no. 3675713 issued by the Department of Environmental Resources to the County of Lancaster, is hereby set aside. The case is hereby remanded to DER for further action consistent with this adjudication.